**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Jason Lianto*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JASON LIANTO, derivatively on behalf of GITLAB INC.,<br><br>Plaintiff,<br><br>v.<br><br>SYTSE SIJBRANDIJ, DAVID DESANTO, BRIAN G. ROBINS, KAREN BLASING, MERLINE SAINTIL, GODFREY SULLIVAN, MATTHEW JACOBSON, SUNDEEP BEDI, and SUE BOSTROM,<br><br>Defendants,<br><br>and<br><br>GITLAB INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Jason Lianto ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint, for the benefit of Nominal Defendant GitLab Inc. ("GitLab" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers, to remedy the Individual Defendants' (defined below) breaches of fiduciary

duties, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, based on the investigation of Plaintiff's counsel, including a review of publicly available information, filings by GitLab with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from June 5, 2023 through June 3, 2024, both dates inclusive (the "Relevant Period").

2. GitLab is a software development company. The Company's main offering is its DevSecOps platform, which allows the teams of software development (Dev), security (Sec), and IT operations (Ops) to work together in a single tool with a single workflow.

3. GitLab offers a three-tiered pricing structure. Its Premium tier customers, which fall between the free and Ultimate tiers, consisted of 60% of the Company's annual recurring revenue ("ARR") in the 2024 fiscal year. ARR is the annualized monthly recurring revenue, which in turn is the aggregate monthly revenue from subscriptions.

4. In March 2023, the Company announced a 54% price increase for its Premium tier customers. Following this price increase, the Premium tier included artificial intelligence ("AI") features for customers.

5. On March 4, 2024, GitLab issued a press release announcing its fourth quarter 2024 financial results, reporting $163.8 million revenue (33% year-over-year growth) and $579.9 million annual revenue (37% year-over-year growth). The Company also announced its fiscal

year 2025 guidance, expecting revenue between $725 and $731 million (a growth rate of only 26% year-over-year). The reduced guidance reflected "normalization in buying behavior."

6. On this news, GitLab's stock price fell 21%, to close at $58.84 per share on March 5, 2024.

7. On June 3, 2024, following the completion of its annual standalone selling price ("SSP") analysis, GitLab announced an estimated $4 million headwind to fiscal 2025 guidance.

8. On this news, GitLab's stock price fell 5%, to close at $44.75 on June 4, 2024.

9. Then, on June 25, 2024, GitLab announced the results of a survey of 5,300 chief experience officers, IT leaders, developers, and security and operations professionals regarding the DevSecOps platform. The Company reported that while 69% of global chief experience officers were shipping software at least twice as fast as the prior year: only 26% had implemented AI; that 56% of respondents found AI to be risky; and that 40% had concerns about privacy and data security as the top obstacle to implementing AI in the software development cycle.

10. On July 1, 2024, GitLab announced a Small and Medium-sized Businesses ("SMB") for $19 per user per month, effectively rolling back the prior year's price increase for this tier.

11. During the Relevant Period, the Individual Defendants caused GitLab to overstate customer retention and customer adoption of AI features offered following the Premium price increase. The Individual Defendants' statements were materially misleading because they failed to disclose that: (i) GitLab's AI features did not have the capabilities expressed; (ii) there was weak market demand for the touted AI integration throughout the software development lifecycle; (iii) the Company was experiencing price sensitivity following the Premium price increase, especially for SMB and mid-market customers; and (iv) as a result of the above, Defendants' statements about GitLab's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12. As a result of the foregoing, a securities class action was filed in this Court against GitLab and Defendants Syste Sijbrandij ("Sijbrandij"), David DeSanto ("DeSanto"), and Brian

G. Robins ("Robins"), styled as *Dolly v. GitLab Inc., et al.,* Case No. 5:24-cv-06244 (the "Securities Class Action").

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and Defendants have received substantial compensation in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

17. Plaintiff is a current shareholder of GitLab and has continuously held GitLab stock at all relevant times.

18. Nominal Defendant GitLab is a Delaware corporation. It is a remote-only company that does not maintain headquarters. The Company's Class A common stock trades on NASDAQ under the ticker symbol "GTLB."

19. Defendant Sijbrandij is GitLab's co-founder and served as Chief Executive Officer ("CEO") from September 2014 to December 2024. He has been a director and Chairman of the Board since September 2014. According to the Schedule 14A filed by GitLab with the SEC on April 30, 2024, Defendant Sijbrandij is a controlling shareholder as of March 31, 2024. Further, Defendant Sijbrandij is named as a defendant in the Securities Class Action.

20. Defendant DeSanto has served as the Company's Chief Product Officer since December 2022. Defendant DeSanto is named as a defendant in the Securities Class Action.

21. Defendant Robins has served as the Chief Financial Officer of GitLab since October 2020. Defendant Robins is named as a defendant in the Securities Class Action.

22. Defendant Karen Blasing ("Blasing") has served as a director of the Company since August 2019. She also serves as Chair of the Audit Committee.

23. Defendant Merline Saintil ("Saintil") has served as a director of the Company since November 2020. She also serves as a member of the Compensation Committee.

24. Defendant Godfrey Sullivan ("Sullivan") has served as a director of the Company since January 2020. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

25. Defendant Matthew Jacobson ("Jacobson") has served as a director of the Company since August 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

26. Defendant Sundeep Bedi ("Bedi") has served as a director of the Company since August 2021. He also serves as a member of the Audit Committee.

27. Defendant Sue Bostrom ("Bostrom") has served as a director of the Company since April 2019. She also serves as the Chair of the Compensation and Leadership Development Committee and a member of the Nominating and Corporate Governance Committee.

28. Defendants Sijbrandij, DeSanto, Robins, Blasing, Saintil, Sullivan, Jacobson, Bedi, and Bostrom are referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29. By reason of their positions as officers, directors, and/or fiduciaries of GitLab and because of their ability to control the business and corporate affairs of GitLab, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

30. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

31. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

32. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

33. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## CODE OF CONDUCT

34. GitLab's Code of Business Conduct and Ethics (the "Code of Conduct") represents that the Company is "committed to the highest standards of legal and ethical business conduct and has long operated its business consistent with written operating principles and policies that reinforce this commitment." Further, it states that the Code of Conduct "summarizes the ethical standards for all directors, officers, employees and contractors of GitLab and of its direct and

indirect subsidiaries ("Team Members ") and is a reminder of the seriousness of our commitment to our values."

35. In the section "Conflicts of Interest" the Code of Conduct states, in relevant part:

> GitLab recognizes and respects Team Members' rights to engage in outside activities that they may deem proper and desirable, provided that these activities do not impair or interfere with the performance of their duties to GitLab or their ability to act in GitLab's best interests. However, all Team Members must avoid situations in which their personal interests may conflict, or appear to conflict, with the interests of GitLab.

36. In the section "Special Ethics Obligations for Team Members with Financial Reporting Responsibilities," the Code of Conduct states, in relevant part:

> The Chief Executive Officer, Chief Financial Officer, and Finance Department personnel bear a special responsibility for promoting integrity throughout the organization, with responsibilities to stakeholders both inside and outside of GitLab. The Chief Executive Officer, Chief Financial Officer, and members of the Finance Department have a special role not only to adhere to these principles themselves but also to ensure that a culture exists throughout GitLab as a whole that ensures the fair, accurate, comprehensive and timely reporting of financial results. Because of this special role, the Chief Executive Officer, Chief Financial Officer, all members of the Finance Department and all other Team Members, must:
>
> - act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;
>
> - provide information that is accurate , complete, objective, timely and understandable to ensure full, fair, accurate, timely, and understandable disclosure in reports and documents that GitLab files with, or submits to, government agencies and in other public communications;
>
> - comply with applicable governmental laws, rules and regulations, and acquire appropriate knowledge of such laws, rules and regulations relating to GitLab' duties sufficient to enable the Team Member to recognize potential dangers and know when to seek legal advice;…

37. In the same section, under the subheading "Insider Trading," the Code of Conduct states, in relevant part:

> Because we believe firmly in transparency and trust across the organization, you may find yourself in possession of inside information. The definition of inside

> information is any material nonpublic information, positive or negative, about GitLab or other organizations with which we work. For a definition of "material non-public information," please see our Insider Trading Policy. Remember that we also may possess confidential information about our customers, partners or other third parties. It is equally important that we treat this information with the same care that we treat our own.
>
> The bottom line is that we never buy or sell securities based on inside information, nor do we tip off others to do so. It doesn't matter how we learned the information—using material nonpublic information to trade securities is never acceptable. Doing so violates the law and the trust we have built with our fellow Team Members, and with our customers, partners and investors, and others.

38. In a section titled "Financial Matters and Business Practices," the Code of Conduct states:

> You are expected to act responsibly and exercise sound judgment with respect to our finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. You may execute financial transactions only with authorization and in compliance with our policies. You also are expected to record and report all financial transactions and business information honestly and accurately, to comply with our system of internal controls and to follow applicable laws, regulations and accounting practices.
>
> We regularly file reports and other documents with regulatory authorities, including the U.S. Securities and Exchange Commission ("SEC"). In addition, we may make other public communications, such as press releases, from time to time.
>
> Depending upon your position with the Company, you may be called upon to provide information to help ensure that our public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to our public disclosures. Team Members involved in preparing public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures.
>
> If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of our CLO. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should follow the procedures set forth in our Whistleblower Policy.

39. In the same section, under the subheading "SEC Reporting and Financial Statements Preparation," the Code of Conduct states, in relevant part:

> Our periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws, and SEC rules. If you contribute in any way to the preparation or verification of our financial statements and other financial information, you must ensure that our books, records and accounts are accurately maintained. You must also cooperate fully with our finance department, as well as our independent public accountants and counsel. If you are involved in the preparation of our SEC reports or financial statements, you must:
>
> - Be familiar with and comply with our disclosure controls and procedures and our internal control over financial reporting.
> - Take all necessary steps to ensure that all filings with the SEC and all other public communications about our financial and business condition provide full, fair, accurate, timely and understandable disclosure.

40. In a section titled "Administration, Waiver, and Amendment," the Code of Conduct States, in relevant part:

> The Audit Committee is responsible for administering the Code. It has established the standards of business conduct contained in this Code and oversees compliance. The Audit Committee has delegated day-to-day responsibility for administering and interpreting the Code to the CLO. While serving in this capacity, the CLO reports directly to the Audit Committee.
>
> Any waiver of any provision of the Code for the benefit of a director or an executive officer (which includes without limitation, for purposes of the Code, GitLab's principal executive, financial and accounting officers), shall be effective only if approved by the Board in its sole discretion. Any waivers of the Code for other Team Members may be made by the CLO or Audit Committee.

41. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' issuance of materially false and misleading statements to the public, instead facilitating the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Additionally, the Insider Selling Defendants (defined herein) violated the Code of Conduct by selling shares of GitLab when in possession of material, non-public information when the stock price was artificially inflated. The

Insider Settling Defendants obtained about $223.4 million in proceeds from such sales. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## AUDIT COMMITTEE CHARTER

42. GitLab also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of GitLab Inc. (the "Company") is to assist the Board in fulfilling its oversight responsibilities relating to:
>
> - the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements;
> - the qualifications, independence and performance of the Company's independent auditors (the "Independent Auditors");
> - the design, implementation and performance of the Company's internal audit function;
> - risk assessment and management; and
> - compliance by the Company with legal and regulatory requirements.
>
> This charter (the "Charter") sets forth the authority and responsibility of the Committee in fulfilling its purpose. The function of the Committee primarily is one of oversight. Although the Committee has the responsibilities and powers set forth in this Charter, it is not the Committee's duty to plan or conduct audits or to determine that the Company's financial statements are complete, accurate and in accordance with generally accepted accounting principles ("GAAP"). Instead, those are responsibilities of the Company's management and the Independent Auditors.

43. Under the heading "Responsibilities and Duties," in a subsection titled "General," the Audit Committee Charter states:

- The principal responsibilities and duties of the Committee are set forth below. These responsibilities and duties are set forth as a guide, with the understanding that the Committee will carry them out in a manner that is appropriate given the Company's needs and circumstances. The Committee may perform such other functions as are consistent with its purpose and applicable law, rules and regulations, as the Board may request or prescribe, or as the Committee deems necessary or appropriate consistent with its purpose.

- The Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the Independent Auditors, in accordance with its business judgment. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The Independent Auditors are responsible for auditing the Company's financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the Independent Auditors' reports.

44. Under the same heading, in a subsection titled "Financial Statements and Disclosures," the Audit Committee Charter states the following, in relevant part:

i. Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results.

ii. Review and discuss the following with management, the internal auditors (if any), and the Independent Auditors, as applicable:

a) the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K;

b) the results of the Independent Auditors' audit or review of the financial statements;

c) all critical audit matters (CAMs) proposed by the Independent Auditor to be included in the Independent Auditor's annual audit report;

d) any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"); and

e) any significant issues, events and transactions as well as any significant changes regarding accounting principles, practices, policies, judgments or estimates.

45. Under the same heading, in a subsection titled "Internal Controls," the Audit Committee Charter states:

i. Review and discuss with the Company's management, its internal auditors (if any), and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

ii. Review any allegations of fraud that are disclosed to the Committee involving management or any Company directors, officers, employees and contractors ("Team Members") with a significant role in the Company's accounting and financial reporting process and systems of internal controls.

iii. Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

iv. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

v. Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (b) the confidential anonymous submission by Team Members of the Company of concerns regarding questionable accounting or auditing matters. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

46. Under the same heading, in a subsection titled "Internal Audit," the Audit Committee Charter states:

> The Committee will oversee the design, implementation and performance of the Company's internal audit function, and approve any changes the Committee determines appropriate, if applicable, including:
>
> i. Approving the annual internal audit plan and all major changes to the plan. Review the internal audit activity's performance relative to its plan.
>
> ii. Reviewing and participating in the selection of individuals to, and any changes in, the Company's senior internal audit position.
>
> iii. Overseeing the internal audit function, including its objectives, responsibilities, independence, performance, annual plan and budget, and staffing.
>
> iv. Periodically meeting separately with management and with internal auditors (or other personnel responsible for the internal audit function).
>
> v. Reviewing the adequacy of the Company' internal audit charter annually and approving any changes the Committee determines appropriate, if applicable.

47. Under the same heading, in a subsection titled "Risk Oversight" the Audit Committee Charter states:

> i. Review with management the Company's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.
>
> ii. Review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches.
>
> iii. Review with management the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time.
>
> iv. Review with management the Company's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.
>
> v. Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

48. Under the same heading, in a subsection titled "Corporate Governance" the Audit Committee Charter states:

> i. Annually prepare a report to the Company's stockholders for inclusion in the Company's annual proxy statement as required by the Commission Rules.
>
> ii. Discharge the responsibilities as set forth in such policies, codes and guidelines approved by the Board.
>
> iii. Review the process for communicating the Company's Code of Conduct to Company personnel, and for monitoring compliance therewith.
>
> iv. Review the related-person transactions under the Company's Related Person Transaction Policy and applicable accounting standards on an ongoing basis and such transactions shall be approved or ratified by the Committee.

49. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' issuance of materially false and misleading statements to the public, instead facilitating the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Additionally, the Insider Selling Defendants violated the Audit Committee Charter by selling shares of GitLab when in possession of material, non-public information when the stock price was artificially inflated. The Insider Settling Defendants obtained about $223.4 million in proceeds from such sales. Also, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Audit Committee Charter, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Audit Committee Charter.

## SUBSTANTIVE ALLEGATIONS

***Background***

50. Gitlab is a software development company. As of January 31, 2023, the end of the Company's 2024 fiscal year, GitLab had more than 30 million registered users and claimed more than 50% of the Fortune 100 companies as customers.

51. GitLab's main offering is its DevSecOps platform, which allows the teams of software development (Dev), security (Sec), and IT operations (Ops) to work together in a single tool with a single workflow.

52. Purportedly, DevSecOps reduces the software development cycle times "from weeks to minutes" by eliminating manual work, increasing productivity, and creating a culture of innovation and velocity.

53. DevSecOps is offered as a self-managed or software-as-a-service ("SaaS") subscription. For self-managed subscriptions, the customer installs GitLab on their own, and the Company offers support, maintenance, upgrades, and updates. SaaS subscriptions are managed by the Company and provide access to the Company's latest version of its product.

54. GitLab's revenue is recognized ratably over the contract period based on the stand-ready nature of subscription elements. The contracts terms are between one and three years and include a license for the Company's proprietary software features. For self-managed customers, to whom the software license is made available, revenue is recognized upfront. When a customer enrolls in a SaaS subscription and the platform is managed by the Company, revenue is recognized ratably when GitLab's performance obligation is satisfied.

55. GitLab offers a three-tiered pricing structure. The free tier offers features to encourage use of the DevSecOps platform and generates leads to become paid customers. Premium, the entry-level paid tier, and Ultimate, the highest-cost offering, present additional features geared toward managers, directors, and executives.

56. For the 2024 fiscal year, Premium subscriptions accounted for approximately 60% of total ARR.

57. On March 2, 2023, GitLab announced a 53% increase for the Premium tier, from $19 to $29 per user per month. Existing Premium customers would pay a one-time transition price of $24 per user per month for upcoming renewals until April 2, 2024.

58. The 53% price increase for Premium users, according to GitLab, reflected the introduction of more than 400 features, including AI and machine learning, to help customers "deliver[] high-quality software faster."

59. As of January 31, 2024, seat expansion represented approximately 40% of the Company's Dollar-Based Net Retention Rate ("DBNRR"), followed by an increased price yield at 40%, and lastly, tier upgrade to Ultimate, at 20%.

***Materially False and Misleading Statements***

60. On June 5, 2023, the Individual Defendants caused GitLab to issue a press release reporting its first quarter 2024 financial results. The press release stated: ***"Today, we deliver more AI-powered capabilities to customers than any other DevSecOps platform."***[1] The press release continued, quoting Defendant Robins as saying: "Against a backdrop of macroeconomic uncertainty, customers are looking to our AI-powered DevSecOps platform to drive efficiencies, increase productivity, and accelerate their pace of innovation. ***We are poised to make the most of the estimated $40B total addressable market opportunity before us."***

61. The same day, GitLab held a conference call to discuss the first quarter of 2024 earnings with analysts and investors (the "1Q24 Earnings Call"). During the call, Defendant Sijbrandij touted GitLab's product capabilities and customer satisfaction, stating, in relevant part:

> We continue to focus on incorporating AI throughout our DevSecOps platform. ***We're innovating at a fast pace. In 1Q, we delivered 5 new AI features. And in the first half of May alone, we delivered 5 additional features. All of these are available to customers now, and we continue to iterate on Code Suggestions. This feature allows developers to write code more efficiently by receiving code suggestions as they type. Code Suggestions is available on gitlab.com for all users while in beta. We expect Code Suggestions will be generally available later this year.*** One of the guiding principles with Code Suggestions is to make it available and accessible to all developers everywhere.
>
> ***We also extended language support so that more developers can realize the benefits of AI on our platform. In 1Q, we increased language support from the initial 6 languages to now 13 languages.*** Code Suggestions is uniquely built with privacy first as a critical foundation. Our customers' proprietary source

[1] All emphasis hereinafter is added, unless otherwise stated.

code never leaves GitLab's cloud infrastructure. This means that their source code stays secure. In addition, model output is not stored and not used as training data. ***AI is not only changing how software is developed, it's also amplifying the value of having a DevSecOps platform.*** DevSecOps is a category that we created, and we're seeing it enter a mainstream adoption phase.

* * *

***This quarter, we had many conversations with senior-level customers,*** but one with the CTO from a top 5 European bank really stands out. At first, we focused on many of our differentiated features that only a DevSecOps platform can provide. For example, we talked about the benefits of Value Stream Dashboards, DORA metrics and compliance on a single platform. When the conversation moved into AI, a CTO said something extremely interesting. He said code generation is only one aspect of the development cycle. If we only optimize code generation, everything else downstream from the development team, including QAs, security and operations, breaks because these other teams involved in software development can't keep up. ***This point, incorporating AI throughout the software development life cycle is at the core of our AI strategy.***

***Today, our customers have the ability to use Code Suggestions for code creation, Suggested Reviewers for code review, Explain This Vulnerability for vulnerability remediation, Value Stream Forecasting for predicting future team efficiency and much more. We're proud to have 10 AI features available to customers today, almost 3x more than the competition.***

***Applying AI to a single data store for a full software development life cycle also creates compelling business outcomes. We believe that this is something that can only be done with GitLab. We see a lot of excitement surrounding AI at the executive level. We are hearing from customers that AI is motivating them to assess how they develop, secure and operate software through a new lens. Enterprise- level companies who may not have been in the market until 2024, 2025, 2026 are reevaluating their strategies.*** On top of that, there's new personas entering the mix. As chief information security officers navigate this new AI-powered world, they are working to empower their teams to benefit from AI and apply appropriate governance, security, compliance and auditability.

***In all, we believe that AI will increase the total addressable market for several reasons.*** First, AI will make writing code easier which, we believe, will expand the audience of people, such as junior and citizen developers who build software. Second, as these developers become more productive, we see software becoming less expensive to create. We believe this will fuel demand for even more software. More developers will be needed to meet this additional demand. And third, ***we expect customers will increasingly turn to GitLab as they build machine learning models and AI into their applications.*** As we add ModelOps capabilities to our DevSecOps platform, this will invite data science teams as new personas, and

> we'll allow these teams to work alongside their Dev, Sec, and Ops counterparts. We see ModelOps as a big opportunity for GitLab.
>
> ***Expanding the addressable market will also create an opportunity to capture greater value. Later this year, we plan to introduce an AI add-on focused on supporting development teams. This new add-on will include Code Suggestions functionality. We anticipate this will be priced at $9 per user per month billed annually. This add-on will be available later this year across all our tiers.*** All of this innovation accentuates a broader theme for our business: the differentiation between a Dev and DevSecOps platform. We believe that an AI-powered platform focused solely on the developer persona is incomplete. It is missing essential security, operations and enterprise functionality.
>
> ***Remember, developers spend only a small fraction of their time developing code. The real promise of AI extends far beyond code creation. And this is where GitLab has a structural advantage.*** We are the most comprehensive DevSecOps platform in the market. Features like Code Suggestions and Remote Development are important accelerants for developer efficiency. ***And to date, GitLab has more AI features geared towards developers than our competitors.*** However, that isn't enough. In order to achieve a 10x faster cycle time on projects, enterprises need an end-to-end platform that works across the entire software development life cycle.
>
> * * *
>
> ***We also believe we're in the early stages of capturing an estimated $40 billion addressable market,*** a market that we've seen evolve from point solutions to a platform, from DIY DevOps to a DevSecOps platform. ***And AI will speed up different aspects of software creation and development. This, in turn, creates the need for a more robust security, compliance and planning capabilities. In today's era of rapid innovation, the power of a platform like GitLab to enable faster cycle times truly shines.***

62. In response to an analyst's question during the 1Q24 Earnings Call, Defendant Robins stated, "I am happy to say that the renewal rates and the churn and the land of new customers have been better than expected." During his prepared remarks, he also stated:

> As we mentioned on the prior call, we raised the price of our Premium SKU for the first time in 5 years. Over that time frame, we added over 400 new features, transitioned from a Dev platform to a DevSecOps platform. We shared that we expected the Premium price increase to have minimum impact in FY '24 with greater impact in FY '25 and beyond. ***The price increase, which took effect on April 3, is going as planned. We only had 1 month of renewals impacted by the price increase in the quarter. To date, customer churn is unchanged for the Premium customers who renewed in April, and our average ARR per customer increased in line with our expectations.***

63. During the 1Q24 Earnings Call, an analyst raised concerns about pressure or deceleration on net retention rates:

> Analyst: Obviously, a stronger-than-expected quarter, but we are seeing this deceleration, I think, across all high-growth tech companies. . . . [H]ow should we think about pressure on net retention rates, customer acquisition that's coming from customers taking a more prudent approach in the current budgetary environment versus, I guess, rethinking needs for dev head count and reevaluating which dev tools to purchase just given all the gen AI innovations lately?

64. In response, Defendant Sijbrandij stated:

> Yes, lots of things to unpack in your question. We see the macro trends continuing, and that's putting pressure on seat count. That was the same last quarter, and we anticipate that trend to continue. At the same time, we're super excited of what the macro is doing to the mindset of customers, because they say, hey, now we – it's time to consolidate. And at the same time, we see that the analysts are seeing that, hey, this is consolidating as a market. So we believe that DevOps platform is going to be the way that people will consolidate. We have the most comprehensive DevSecOps platform, which is also great if you look at the application of AI.
>
> ***We're able to apply AI not just for Code Suggestions but apply it across the entire spectrum. We have more than 10 features that we were able to ship. And those 10 features, they drive value at every part along the stage. And as for how that influences the TAM, which you alluded to, we think AI is going to make it easier for more people to enter the fray. So we think it was a supply of more people using the product.***
>
> ***At the same time, when you see that software development becomes easier, we believe there's going to be more demand for it. Software development used to be very expensive. AI makes it more affordable. There's going to be more demand. And more demand, again, means more people entering the fray.*** And last but certainly not least, it's an opportunity for us to manage not just the code that companies have, but also their models. And that's what we do with our MLOps functionality. We already allow you to run experiments with GitLab. We want to extend to a full MLOps managed platform where we add the data engineers to the constituents that use GitLab.

65. During the 1Q24 Earnings Call, in response to an analyst's question about GitLab's generative AI capabilities compared to the competition, Defendant Sijbrandij stated:

> ***So we're really fortunate that we have a single application, a single data store for the entire DevSecOps cycle, and we can apply AI to all of them. And that's led us to having 3x as many publicly usable AI features as our competition. That is a big advantage.*** As long as at the beginning that, of course, you also need the

> code suggestions. But having the whole rest make sure that if you get more effective there, it works, and you get a faster cycle time throughout, and that's a really exciting development.

66. During the 1Q24 Earnings call, in response to an analyst's question about the trends in the expected number of seats, Defendant Sijbrandij stated:

> One other way to look at it is you have generative AI. It produces more code. All that codes also needs to be secured, also need to put in operations. ***So if you don't have a good DevSecOps platform, you create a bottleneck at the beginning. That bottleneck is solved with the DevSecOps platform.***

67. During the 1Q24 Earnings Call, Defendant Robbins had the following exchange with an analyst regarding the mix of Ultimate and Premium subscribers:

> Analyst: It sounds like some of the strength there [on Ultimate] was driven from a business that was up for renewal in a smaller price point delta between Premium, Ultimate, and it also sounds like there was some strength there just on net new customers landing at Ultimate. But I'm just curious given there's more renewal businesses sort of we progressed through 2Q in the second half, should we expect the Ultimate mix to continue to uptick here?
>
> Defendant Robins: As we said before, and I think it's worth saying again, we don't compensate the sales team to sell Ultimate versus Premium. And so that is an output and not something that we're solving for. We want to deliver the best solution for the customer and get them a quick time to value and a positive business outcome. And so Ultimate had strength in the quarter. It's really driven by compliance, security and all the additional product features that Ultimate has. ***When you go through and look at Ultimate and look at expansion, first orders and so forth, Ultimate performed well in a lot of the categories as expected. And so where we saw some pockets of weakness was really in Premium on expansion of our existing clients*** as well as the contraction. ***Churn was relatively low***, but we still saw some contraction as well. And so like I said, Ultimate had a good quarter. ***There was some pockets of weakness in Premium, I'll call them watch points that we continue to watch.*** But overall, happy with what we delivered.

68. In response to a question during the 1Q24 Earnings Call about AI capabilities compared to competitors, Defendant Sijbrandij said:

> ***So we're really fortunate that we have a single application, a single data store for the entire DevSecOps cycle, and we can apply AI to all of them. And that's led us to having 3x as many publicly usable AI features as our competition. That is a big advantage.*** As long as at the beginning that, of course, you also need the code suggestions. But having the whole rest make sure that if you get more

> effective there, it works, and you get a faster cycle time throughout, and that's a really exciting development.

69. On September 5, 2023, the Individual Defendants caused GitLab to issue a press release reporting its second quarter 2024 financial results. Therein, Defendant Sijbrandij stated: ***"GitLab's strong quarter is a result of our focus on creating a differentiated and innovative DevSecOps platform*** and executing on a strong go-to-market motion[.] …We believe that our rapid pace of product innovation and strong customer demand position us to capture a greater share of the estimated $40 billion total addressable market opportunity."

70. That same day, the Company held an earnings call in connection with the second quarter 2024 financial results (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Sijbrandij remarked, in relevant part:

> ***I'm pleased with our second quarter results. They demonstrate continued momentum and solidify our category leadership. With our recent analyst and customer validation, we are well positioned to win in the estimated $40 billion market opportunity.*** I'd like to thank our customers for trusting GitLab.

71. During the 2Q24 Earnings Call, Defendant Sijbrandij highlighted the Company's AI capabilities:

> ***We are developing AI powered capabilities across the entire software development life cycle. Let me share just a few of these capabilities. Code Suggestions uses generative AI to suggest code to developers. Suggested Reviewers leverages AI to identify the most appropriate reviewers of code. Explaining this vulnerability provides details about potential security vulnerabilities in code. And Code Suggestions remains on track to be generally available later this year. We differentiate our approach to AI in several ways. We have a commitment to privacy and transparency in our use of AI, and we also deliver AI throughout the entire software development life cycle.***

72. During the 2Q24 Earnings Call, Defendant Sijbrandij claimed that customer response to GitLab's AI capabilities was "very positive":

> [T]he early feedback to Duo ***has been very positive. Customers get that they need AI features, not just for example, coding, but they need them throughout the DevOps life cycle.*** And we've just published a report actually, we're publishing it today, the state of DevOps. And even for developers, which is only kind of 1/3 of a DevSecOps platform, only 25% of their time is spent coding, 75% of their time is elsewhere. So it's really important to have a set of features throughout the life

> cycle. We're really happy that we have 10 features out there already. And some of the oldest feature we have Suggested Reviewers has over 100,000 users today. So we're excited about progressing that further. ***And it's great to see that customers recognize that they need a suite of AI features, and therefore, we're excited about Duo.***

73. During the 2Q24 Earnings Call, Defendant Robins stated that "customer behavior was in line with our expectations." Specifically, he continued:

> We also continue to make target investments in key product areas. These include security, compliance, AI and agile planning. ***Part of our responsible growth strategy is to continue to optimize our pricing and packaging. In April of this year, we raised the price of our premium SKU*** for the first time in 5 years. Over that time frame, we added over 400 new features. ***We believe this better aligns price with value for our customers*** and the investment we made over the past 5 years.
>
> ***In the first 4 months post launch, customer behavior was in line with our expectations. As a reminder, we anticipate minimal impact to our financials from this change in the current year. We expect the price increase to have a much larger impact in FY '25 and beyond.***
>
> Looking back at the quarter. I want to touch on customer buying patterns, contraction and Ultimate trends. First, ***customer purchasing behavior in Q2 was consistent with Q1 of FY '24. We believe buying patterns appear to have stabilized.*** Second, contraction was lower than Q1 of FY '24 and appears to be stabilizing. Third, Ultimate, our top tier continues to see strong adoption driven by customer wins for security and compliance use cases.

74. During the 2Q24 Earnings Call, Defendant Robins claimed the Premium price increase would drive long-term business, stating:

> We remain on track to achieve free cash flow breakeven for FY '25. ***There are a number of drivers we are introducing that we believe should help fuel our business in FY '25. I touched on the first one earlier, which is the price increase in our premium tier.*** Additionally, in Q2, we started enforcing user limits on our free SaaS tier. It's early, but we have seen additional free users upgrade to premium. The third driver is the launch of Dedicated. This allows us to address new opportunity for companies with complex security and compliance requirements. ***Finally, we plan to monetize our AI capabilities by launching an add-on that will include code suggestions functionality later this year.***

75. During an exchange with an analyst on the 2Q24 Earnings Call, Defendant Robins also assured that customer retention was above internal expectations following the Premium price increase:

> Analyst: Obviously, earlier this year, you announced a price increase in the way that's structured a lot of that won't be felt until fiscal 2025 and 2026. But now that it's been several months, can you maybe give us an update on kind of what you're seeing and hearing from customers on the price increase, retention trends and stuff like that?
>
> Defendant Robins: And on the price increase, last quarter when we had our call, we only had a month of data. So happy to say we have 3 months of data this quarter. And I'm happy with the results. ***It's been in line to slightly above our expectations.*** As a reminder, we implemented the price increase because we put 400 new features in the platform, and we wanted that to match the value that we are providing to our customer. And so the guidance that we provided for this quarter as well as the full year includes that impact. When we went -- ***when we announced the price increase, we talked about just due to the ratable nature of the revenue and renewals coming up through the year. There would be very little impact in FY 2024 and the majority of the impact would come in FY 2025 with all the impact realized in the year of FY 2026.***
>
> * * *
>
> Analyst: Brian, your comment was customer behavior and the premium price increases in line with expectations. I just wanted to double click on that a bit. What does that mean? Does that mean that they're just – they're effectively taking the price increase? Are you seeing any -- I know it's not a factor, but typically that you've talked about, but are any moving to Ultimate? Just maybe a little bit more color on what in line with your expectations means?
>
> Defendant Robins: Yes. Absolutely, Matt. When we did the price increase, we did an internal model that looked at bookings, churn, and we came up with what we thought our forecast would be on the overall net bookings. ***And so I would say overall bookings is more positive than our internal forecast and churn is less. And so we're seeing positive signs on every element of how we modeled it from a bookings and churn perspective.***

76. During an exchange with an analyst on the 2Q24 Earnings Call, Defendant Sijbrandij acknowledged that customers were more receptive to the Company's Ultimate tier:

> Analyst: . . . I wanted to ask you on Ultimate. As existing premium customers kind of look to pay the higher price, are you seeing some of the conversations lead to kind of upgrading to Ultimate, especially as you have to get people and flow in some of the AI capabilities as well like suggested reviewers. Are those

> conversations from premium customers looking to upgrade starting to happen more?
>
> Defendant Sijbrandij: Yes, whatever we expect is baked into our guidance, but ***we're seeing that it is a reason for people to reevaluate which tier am I going to be on. And we're seeing Ultimate being more and more top of mind for people.*** We haven't decided on the packaging of the AI features yet. So although AI is a significant part of the conversation, it's not driving Ultimate per se because we're still working on our packaging for the AI features.

77. Also during the 2Q24 Earnings Call, Defendant Robins commented on buying patterns and the Company's DBNRR during an exchange with an analyst:

> Analyst: Brian, I just wanted to touch on the macro a little bit more. I appreciate the commentary and noting that NRR contracted again a little bit sequentially. So any guideposts you can put or rails around where that might go? I think you gave us a lot of indications around stabilization with behavior being consistent, some of the other metrics that you threw out. So just want to understand maybe where that NRR might bottom?
>
> Defendant Robins: So as I mentioned earlier, we did see some stabilization in Q2 over Q1. Customers are still buying what they need. And so the fact that last year, they're buying a lot more. In this year, they're just buying what they need is why you're seeing a slight drop in the net dollar retention rate. I am happy to say that every year since we've launched is still expanding. And so customers are still buying more year-over-year than what they've bought historically. ***When you look at sort of – I've talked about historically that the watch point in the business was around contraction, and that was primarily contraction expansion primarily in our premium seats. I'm happy this quarter, we actually had a very good expansion quarter. Contraction has leveled out, and churn has always been much smaller. But both of those are reflected in the guidance going forward.***
>
> We didn't give out sort of what a target number is or where we think it will bottom out. If you look in the business, though, contraction started late in fourth quarter of last year. ***And so we're about 3 quarters into this. Average contract length is a little over 14 months. So I expect we have another quarter, 1.5 quarters to go until we work through the cycle of the new buying patterns.***

78. On December 4, 2023, the Individual Defendants caused GitLab to issue a press release announcing its third quarter 2024 financial results. It stated, in relevant part:

> "We delivered a strong quarter, which was driven by the continued adoption of our DevSecOps Platform," said Sid Sijbrandij, GitLab CEO and co-founder. "GitLab is the only DevSecOps company that integrates security, compliance, and AI into one platform. With enterprises facing complexity from all directions, they

> need a partner to help them realize business value. GitLab helps improve developer productivity and reduces software spend, which is why our customers report seeing 7x faster cycle times with GitLab."
>
> "Revenue grew 32% year-over-year, which demonstrates continued business momentum driven by our market-leading platform approach," said Brian Robins, GitLab chief financial officer. We continue to grow responsibly and delivered over 2,200 basis points of non-GAAP operating margin expansion. I am pleased to share that we had our first quarter of non-GAAP operating profit while continuing to invest in key product areas including security, compliance, AI, and Enterprise Agile Planning."
>
> * * *
>
> - Announced updates to GitLab Duo, the company's suite of Artificial Intelligence ("AI") capabilities, including:
>     - The beta release of GitLab Duo Chat, a natural-language AI assistant that provides users with real-time guidance, insights, and suggestions to help analyze code, assist with planning, understand and fix security issues, and troubleshoot CI/CD pipeline failures.
>     - Code Suggestions, which helps development, security, and operations teams create new code and update existing code to reduce cognitive load, improve efficiency, and enable them to build more secure software faster, will be generally available in the GitLab 16.7 December 2023 product release.
>     - The beta release of Vulnerability Summary, which provides AI generated explanations of security vulnerabilities and suggestions for how to fix them.

79. The same day, GitLab held a conference call to discuss the third quarter 2024 financial results (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Sijbrandij stated, in relevant part:

> Now I'd like to discuss our second topic, which is our unique approach to AI. ***We already have 14 AI features available to our customers.*** That's more than any other DevSecOps platform we continue to innovate. ***GitLab Duo is our suite of AIpowered DevSecOps workflows that enables customers to boost speed and efficiency without sacrificing privacy, security and compliance.***
>
> We have 3 principles in our AI strategy. First, we're the only platform that integrates AI throughout the entire software development life cycle. As developers become more effective, we enable security and operations team members keep

> pace. Also, developers only spend 25% of their time writing code. AI within DevSecOps should focus on more than just code creation.
>
> Second, we are privacy and transparency first in our approach to AI. ***Our customers are eager to use AI,*** but they want to do so responsibly. To support them with this, we do not use their code to train the AI models used by other customers. Our privacy- first approach is why more than 50% of the Fortune 100 trust GitLab to secure their intellectual property.
>
> And third, our AI is powered by a diverse set of models from technology partners as well as our own AI models. That allows us to select the best AI model for each use case. ***In Q3, we released the beta of GitLab Duo Vulnerability summary.*** This is a cool feature that provides AI-generated explanations of security vulnerabilities and suggestions for how to fix them. ***Another example of our progress is GitLab Duo Code Suggestions, our AI-powered code creation feature. It will be generally available in our December product release. We have been hearing from our customers that they are seeing efficiency improvements upwards of 50% with Code Suggestions.***
>
> ***And finally, we recently announced the beta release of GitLab Duo Chat.*** With GitLab Duo Chat users can quickly understand project status, get help with planning and configuration, receive explanations of suggested code and generate tests, all without contact switching. To start, GitLab Chat is available within GitLab UI, Web IDE and VS Code. We plan to add support for more editors in the future.
>
> ***Our approach to AI is resonating with our customers.*** For example, Amado Gramajo, Vice President of Infrastructure & DevOps at Nasdaq, recently shared his excitement about how Gitlab Duo will help Nasdaq protect their intellectual property and stay in line with regulatory mandates. And presenting at this year's Gartner Application Innovation Summit, Bal Kang at NatWest said, 'GitLab Duo enables our developers to be more productive, efficient and successful in creating secure code. We're excited to see the benefits of GitLab's AI features across the entire value chain, and even our most seasoned engineers are seeing value.'

80. During the 3Q24 Earnings Call, Defendant Robins addressed customer buying behavior, stating:

> Looking back at the quarter, I want to share some of the areas we have been closely monitoring. These include sales cycles, win rates, contraction and Ultimate. In comparing Q3 with Q2 of FY '24, we have seen overall sales cycles lengthen. During Q3, buying behavior in our Enterprise segment stabilized. ***However, in the mid- market and SMB, we see customers continue to be cautious in an uncertain macro environment.*** We have adopted our go-to-market approach in this environment to deliver predictable and strong results. In Q3, our win rates have

> improved, signaling that the value proposition of the DevSecOps platform is resonating in the market. Contraction during Q3 also improved for the third consecutive quarter and is in line with levels from Q3 last year. …

81. In response to a question during the 3Q24 Earnings call about the Premium tier price increase and transitioning from free-to-pay usage, Defendant Robins stated:

> Thanks for the question. And so we did implement a user limit on gitlab.com, and it's led good conversion from free to paid. However, the vast majority just fall below $5,000, the base customer limit that we report, and so the impact is relatively low. We're continuing to pursue that product-led growth. We think it will be – it's built into our guidance. And so that's on free to pay.
>
> I'll also take this as just an opportunity. I know a lot of you have had a wide range of outputs in the model for FY 2025 related to the Premium price increase. We're halfway through our planning process right now. So we aren't giving guidance for next year. It's still a bit early. But the early work that we've done, we believe that the Premium price increase will contribute roughly $10 million to $20 million in revenue for next year. And so it should help you out from a modeling perspective.

82. During the 3Q24 Earnings Call, Defendant Robins claimed that SMB and mid-market orders were lower than expected, but that the Premium price tier was still in line with expectations:

> We're happy with the performance of the Premium price SKU. ***It's in line with what we modeled. One of the things that we've noted is first orders, especially in SMB and mid-market, are lower than expected.*** And you'll see some of that in the base customers of greater than $5,000. But overall, we're happy with the Premium price impact, and it's in line with our expectations.

83. The Individual Defendants' above statements were materially misleading because they failed to disclose that: (i) GitLab's AI features did not have the capabilities expressed; (ii) there was weak market demand for the touted AI integration throughout the software development lifecycle; (iii) the Company was experiencing price sensitivity following the Premium platform's price increase, especially for SMB and mid-market customers; and (iv) as a result of the above, Defendants' statements about GitLab's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***<u>The Truth Begins to Emerge, but the Materially False and Misleading Statements Continue</u>***

84. On March 4, 2024, GitLab issued a press release announcing its fourth quarter and full year 2024 financial results. The press release reported $163.8 million revenue (33% year-over-year growth) and $579.9 million annual revenue (37% year-over-year growth).

85. The press release also included GitLab's guidance for the fiscal year 2025 that included expected revenue between $725 and $731 million. This guidance represented a growth rate of approximately 26% year-over-year.

86. Further, the press release announced that GitLab's Duo Pro, a paid add-on for AI features such as Code Suggestions, Chat, and other organizational control capabilities, was priced at $19 per user per month, $10 above the initial target price.

87. On March 4, 2024, GitLab held a conference call in connection with the release of its fourth quarter 2024 financial results (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendants acknowledged that the lower-than-expected guidance was due to "normalization in buying behavior," which caused Defendants to be "less conservative this year than in the first 2 years."

88. This guidance did not reflect the Company's annual evaluation of its SSP, which had not yet been completed.

89. Also during the 4Q24 Earnings Call, Defendant Robins admitted that GitLab needed time to "build its pipeline and close on new products" before they could have a "meaningful impact on [GitLab's] ratable business model."

90. On this news, GitLab's stock price fell 21%, to close at $58.84 per share on March 5, 2024.

91. Despite this disclosure, the Individual Defendants continued to make materially false and misleading statements. For example, during the 4Q24 Earnings Call, Defendant Robins had the following exchange with an analyst regarding customer buying behavior and its impact on the lower-than-expected guidance:

> Analyst: So I think in prior quarters, you noted that sales cycles for the SMB, mid-market have been elongated, and in this quarter, you said enterprise did better than expected. So did SMB continue to be more challenged? Did the sales cycles improve? Just elaborate on what you're seeing in the SMB, mid-market segment.
>
> Defendant Robins: Thanks for that, Shelby. We're seeing customer buying behavior normalizing across the board. We didn't break out the sales cycles for SMB and mid-market in particular. But as I said, the churn and contraction, it's best that we see in 6 quarters, and sales cycles have normalized across the board.

92. Defendant Robins was also asked, during the 4Q24 Earnings Call, about GitLab's shift to a more conservative approach to guidance:

> Analyst: Brian, to your comment that you're electing to take a less conservative posture on the guidance, maybe a two-parter. Why – what's the logic there? Is it just that GitLab is now a big organization across a bigger scale and customer base, you've just got a little more precise visibility? Is that it? Or is it in reaction to the environment?
>
> Defendant Robins: Yes. Thanks for that, Karl. Going into our third year as a public company and also seeing the normalization of buying behavior, we'll just be less conservative in the guidance that we're giving out.
>
> Analyst: Okay. And then I guess the follow-up would be did you make that change for the fourth quarter such that the beat you just put up in the January quarter might -- we can look as kind of a start of this more conservative guidance posture. Or is it more going forward?
>
> Defendant Robins: No, it's more going forward. Very happy with the bookings this quarter. We had the largest bookings quarter in company history. There is many firsts within the quarter: largest hyper-scaler contribution, largest first order, largest Ultimate, and we had a greater number of $1 million-plus deals. There was some linearity in the quarter. Things came more back in, in the quarter than expected.

93. Regarding changes in customer behavior, Defendant Robins, during the 4Q24 Earnings Call, had the following exchange with an analyst:

> Analyst: I know in the Q&A, I think you had called out, from a linearity perspective, the quarter seemed to be a little bit more back half weighted. And so just curious -- again, we're trying to get our arms around this guidance here. Was there any change in customer behavior or purchasing patterns as we moved into -- we now have, call it, a month or 2 under our belt for the current quarter? Or were things relatively unchanged as far as the spending patterns you're seeing?

> Defendant Robins: Yes. Thanks for that. We typically haven't commented sort of up into earnings. We comment sort of up until the quarter close. ***And we did see normalization across the entire -- across enterprise, mid-market and SMB.*** And I've also mentioned that we saw churn and contraction back to what we've seen 6 quarters ago. And so that obviously gave us some confidence to the guidance we gave.

94. Defendant Robins, during the 4Q24 Earnings Call, spoke to trends in the Company's DBNRR in response to a question from an analyst:

> Jason Noah Ader – William Blair & Company, LLC: Brian, just trying to square, I guess, with everybody else the guidance with the less conservative posture comment. In particular, if NRR is trending up and is around 130%, doesn't this imply that NRR would have to decline from here for revenue growth to be in the mid-20s?
>
> Defendant Robins: There's a number of factors that go into our guidance. We build it from a bottoms-up perspective. And I would just say that what we reported was actuals and what we're guiding to is guidance, right? So it's not comparing apples to apples.

95. In addition to the above statements, at several conferences attended by industry leaders and investors that took place during the Relevant Period, Defendants made false and materially misleading statements related to GitLab's ability to develop and incorporate AI throughout the software development lifecycle, thereby increasing market demand, as well as about the Company's competitiveness in the industry, its customers' buying behavior, and the impact of the Premium price increase on key metrics, among other things. Such instances include:

- Defendant Sijbrandij's statements at the Goldman Sachs Communacopia & Technology Conference on September 7, 2023;
- Defendant Robins' statements at the Piper Sandler Growth Frontiers Conference on September 12, 2023;
- Defendant DeSanto's statements at the RBC Capital Markets Global Technology, Internet, Media, and Telecommunications Conference on November 14, 2023; and
- Defendant Robins' and Sijbrandij's statements at the Morgan Stanely Technology Media & Telecom Conference on March 7, 2024.

***The Materially False and Misleading Proxy Statement***

96. On April 30, 2024, Defendants Sijbrandij, Blasing, Saintil, Sullivan, Jacobson, Bedi, and Bostrom caused GitLab to issue a proxy statement, pursuant to Section 14(a) of the Exchange Act (the "2024 Proxy Statement"), soliciting stockholder votes in favor of four proposals, the: (i) re-election of Defendants Bedi and Bostrom to new terms as directors; (ii) approval of KPMG LLP as GitLab's independent registered public accounting firm for the fiscal year 2025; (iii) approval of executive compensation on an advisory basis; and (iv) approval of an amendment to GitLab's Restated Certificate of Incorporation regarding limiting the liability of certain officers.

97. The 2024 Proxy Statement incorporated, by reference, the purported risk factors stated in the Form 10-K for the period ended January 31, 2024, which stated:

> As our product offerings and the markets for our services mature, or as new competitors introduce new products or services that are similar to or compete with ours, we may be unable to attract new customers at the same price or based on the same pricing model as we have used historically. Moreover, some customers may demand greater price concessions or additional functionality at the same price levels. As a result, in the future we may be required to reduce our prices or provide more features without corresponding increases in price, which could adversely affect our revenues, gross margin, profitability, financial position and cash flow.
>
> In addition, our customers have no obligation to renew their subscriptions for our services after the expiration of the initial subscription period. A majority of our subscriptions are on a one-year period. Our customers may renew for fewer or other elements of our services or negotiate for different pricing terms. Our customers' renewal rates may decline or fluctuate as a result of a number of factors, including their dissatisfaction with our pricing or our services, their ability to continue their operations and spending levels, and changes in other technology components used within the customer's organization. Changes in product packaging, pricing strategy, or product offerings, or the implementation or execution of the foregoing, may not be seen favorably by our customers and may have an adverse effect on our ability to retain our current customers and acquire new ones***. For example, we have previously discontinued certain lower priced product offerings, and during fiscal year 2024 we implemented a price increase in our Premium tier product offering, which may cause customers who previously used these tiers to opt for our free version or to cease using our products completely.*** We may also decide to raise the prices of our product offerings in the future. If our customers do not renew their subscriptions on similar

> pricing terms, our revenues may decline, and our business could suffer. In addition, over time the average term of our contracts could change based on renewal rates or for other reasons.

98. Regarding the "Board of Directors' Role in Risk Oversight," the 2024 Proxy Statement said:

> Our board of directors, as a whole, has responsibility for risk oversight, although the committees of our board of directors oversee and review risk areas that are particularly relevant to them. The risk oversight responsibility of our board of directors and its committees is supported by our management reporting processes, which are designed to provide visibility to our board of directors and to our personnel that are responsible for risk assessment and information about the identification, assessment and management of critical risks and management's risk mitigation strategies. These areas of focus include competitive, economic, operational, financial (accounting, credit, investment, liquidity and tax), legal, regulatory, cybersecurity, privacy, compliance and reputational risks. Our board of directors reviews strategic and operational risk in the context of discussions, question and answer sessions, and reports from the management team at each regular board meeting, receives reports on all significant committee activities at each regular board meeting, and evaluates the risks inherent in significant transactions. Our audit committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management.
>
> Each committee of our board of directors meets with key management personnel and representatives of outside advisors to oversee risks associated with their respective principal areas of focus. Our audit committee reviews our major financial risk exposures, our internal control over financial reporting, our disclosure controls and procedures, legal and regulatory compliance, and, among other things, discusses with management and our independent auditor guidelines and policies with respect to risk assessment and risk management. Our audit committee also reviews matters relating to cybersecurity and data privacy and security and reports to our board of directors regarding such matters. Our compensation and leadership development committee evaluates our major compensation related risk exposures and the steps management has taken to monitor or mitigate such exposures. Our nominating and corporate governance committee assesses risks relating to our corporate governance practices, the independence of our board of directors and reviews and discusses the narrative disclosure regarding our board of directors' leadership structure and role in risk oversight. We believe this division of responsibilities is an effective approach for addressing the risks we face and that our board leadership structure supports this approach.

99. With respect to the Company's Code of Conduct, the 2024 Proxy Statement said:

> We have adopted a Code of Business Conduct and Ethics that applies to all of the members of our board of directors, officers and team members. Our Code of Business Conduct and Ethics is posted on the "Investor Relations" section of our website, which is located at https://ir.gitlab.com under "Documents & Charters" in the "Governance" section of our website. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our Code of Business Conduct and Ethics by posting such information on our website at the address and location specified above.

100. Defendants Sijbrandij, Blasing, Saintil, Sullivan, Jacobson, Bedi, and Bostrom caused the 2024 Proxy Statement to be false and materially misleading because it concealed that GitLab's price increase for its Premium tier had already impacted customer retention and that, as a result, the Company would reverse the price increase as to SMB customers. Specifically, the 2024 Proxy Statement failed to disclose that: (i) GitLab's AI features did not have the capabilities expressed; (ii) there was weak market demand for the touted AI integration throughout the software development lifecycle; (iii) the Company was experiencing price sensitivity following the Premium platform's price increase, especially for SMB and mid-market customers; and (iv) as a result of the above, the Individual Defendants' statements about GitLab's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

101. The 2024 Proxy Statement was also false and misleading because: (i) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; (ii) the Individual Defendants failed to report violations of the Code of Conduct, and (iii) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

102. On June 13, 2024, the Company filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the 2024 Proxy Statement. As a result of the false and misleading statements in the 2024 Proxy Statement by Defendants Sijbrandij, Blasing, Saintil, Sullivan, Jacobson, Bedi, and Bostrom, shareholders voted to: (i) re-elect Defendants Bedi

and Bostrom to new terms; (ii) ratify KPMG LLP as GitLab's independent registered public accounting firm for the fiscal year 2025; (iii) approve executive compensation on an advisory basis; and (iv) approve an amendment to the Company's Certificate of Incorporation to limit the liability of certain officers.

***The Truth Emerges***

103. On June 3, 2024, following the completion of its SSP analysis, the Company announced its financial reports for the first quarter of fiscal year 2025. GitLab announced an estimated $4 million headwind to fiscal 2025 guidance as compared to the guidance revealed in the fiscal 2024 guidance. Further, it revealed that the Company's ARR increase was only 21% year-over-year, five points below the consensus growth expectations, and that its DBNRR decreased by 1 point to 129%.

104. On this news, the Company's stock price fell almost 5%, to close at $44.75 on June 4, 2024.

105. On June 25, 2024, GitLab announced the results of a survey regarding DevSecOps, which included 5,300 chief experience officers, IT leaders, developers, and security and operations professionals. The Company reported that, while 69% of global chief experience officers were shipping software at least twice as fast as the prior year, only 26% had implemented AI. Further, 56% of respondents found AI to be risky and 40% cited privacy and data security concerns as the top obstacle to implementing AI in the software development cycle.

106. On July 1, 2024, GitLab announced an SMB Premium Tier for $19 per user per month, effectively rolling back the prior year's price increase for Premium customers. The Company also offered Duo Pro for 60-day free trial for new and existing customers, underscoring the weak market demand for AI-powered features in the software development cycle.

107. On September 10, 2024, Defendant Robins admitted, in response to a question from an analyst about the impact of the price increase of the Premium tier, that the Company had "actually seen a little price sensitivity [] in SMB and mid-market," which resulted in lower Base Customers added.

108. On December 5, 2024, the Company announced that Defendant Sijbrandij would step down as CEO. He would remain on as Chairman of the Board. William Staples would become the next CEO of GitLab.

**<u>INSIDER SALES DURING THE RELEVANT PERIOD</u>**

109. As a result of the false and misleading statements the Individual Defendants caused GitLab to make, the Company's share price was artificially inflated. Certain of the Individual Defendants, namely Sijbrandij, Robins, Bedi, Bostrom, Jacobson, and Porter (the "Insider Selling Defendants"), while in possession of material, nonpublic information, capitalized on the artificially inflated stock price by selling significant portion of their holdings of GitLab common stock for a total of approximately $223.4 million.

110. Defendant Sijbrandij, while the Company's stock price was artificially inflated, sold 3,147,000 shares of GitLab stock, receiving approximately $191.4 million in proceeds.

111. Defendant Robins, while the Company's stock price was artificially inflated, sold 288,000 shares of GitLab stock, receiving approximately $16.9 million in proceeds.

112. Defendant Bedi, while the Company's stock price was artificially inflated, sold 9,000 shares of Company stock, receiving approximately $527,760 in proceeds.

113. Defendant Bostrom, while the Company's stock price was artificially inflated, sold 105,000 shares of Company stock, receiving approximately $5.8 million in proceeds.

114. Defendant Jacobson, while the Company's stock price was artificially inflated, sold 171,053 shares of Company stock, receiving approximately $8.5 million in proceeds.

115. Defendant Porter, while the Company's stock price was artificially inflated, sold 1,371 shares of Company stock, receiving approximately $86,750 in proceeds.

116. The Insider Selling Defendants' sales, made with knowledge of material nonpublic information before the truth was exposed, demonstrate their motive in facilitating and participating in the scheme to cause GitLab to make false and misleading statements.

## DAMAGES TO GITLAB

117. As a direct and proximate result of the Individual Defendants' misconduct, GitLab has expended and will continue to expend many millions of dollars.

118. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to GitLab. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

119. As a direct and proximate result of the Individual Defendants' conduct, GitLab has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties. The credibility and motives of management are now in serious doubt.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

120. Plaintiff brings this action derivatively in the right of and for the benefit of GitLab to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

121. GitLab is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

122. Plaintiff is an owner of GitLab stock and has been a continuous shareholder of Company stock at all relevant times.

123. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in

derivative litigation.

124. At the time this suit was filed, the Board consisted of Defendants Sijbrandij, Blasing, Saintil, Sullivan, Jacobson, Bedi, and Bostrom (the "Director Defendants") and non-party director Bill Staples.

125. Plaintiff is required to show that a majority of the current Director Defendants cannot exercise independent objective judgment about whether to bring this action.

126. Plaintiff did not make a demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

127. Demand is excused as to Defendant Sijbrandij. Defendant Sijbrandij is the Company's former CEO and therefore is not independent under NASDAQ listing rules, as the Company admits. Defendant Sijbrandij co-founded the Company in 2011 and served as its CEO from September 2014 until December 2024. He also has served as the Chairman of the Board since September 2014. Thus, he presided over GitLab during the period that material information was concealed. In addition to being the controlling shareholder of the Company, Sijbrandij derived substantial income from his role at GitLab. Further, as an Insider Selling Defendant, he was motivated to keep GitLab's stock artificially inflated so Sijbrandij could personally benefit. Defendant Sijbrandij also solicited the 2024 Proxy Statement. In doing so, Defendant Sijbrandij took affirmative steps to protect himself from liability by successfully soliciting shareholders to vote to amend the Company's Certificate of Incorporation to limit his liability from certain breaches of fiduciary duties. As the Company's highest ranking officer during the Relevant Period, he conducted little, if any, oversight of the scheme to cause GitLab to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. Moreover, he is named as a defendant in the Securities Class Action. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Sijbrandij.

128. Demand is excused as to Defendant Bedi. Defendant Bedi has been a Company director since April 2019. Bedi derives substantial income from serving as a director of GitLab.

He also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to his re-election to the Board. Moreover, as an Insider Selling Defendant, Bedi was motivated to keep GitLab's stock artificially inflated so he could personally benefit. As a trusted Company director, Bedi conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Bedi.

129. Demand is excused as to Defendant Blasing. Defendant Blasing has been a Company director since August 2019. Blasing derives substantial income from serving as a director of GitLab. She also solicited the 2024 Proxy Statement, which contained false and misleading statements. As a trusted Company director, Blasing conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded her duties to monitor internal controls, and failed to protect corporate assets. As she breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Blasing.

130. Demand is excused as to Defendant Bostrom. Defendant Bostrom has been a Company director since April 2019. Bostrom derives substantial income from serving as a director of GitLab. She also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to her re-election to the Board. Moreover, as an Insider Selling Defendant, Bostrom was motivated to keep GitLab's stock artificially inflated so he could personally benefit. As a trusted Company director, Bostrom conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded her duties to monitor internal controls, and failed to protect corporate assets. As she breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Bostrom.

131. Demand is excused as to Defendant Jacobson. Defendant Jacobson has been a

Company director since April 2018. Jacobson derives substantial income from serving as a director of GitLab. He also solicited the 2024 Proxy Statement. Moreover, as an Insider Selling Defendant, Jacobson was motivated to keep GitLab's stock artificially inflated so he could personally benefit. As a trusted Company director, Jacobson conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Jacobson.

132. Demand is excused as to Defendant Saintil. Defendant Saintil has been a Company director since November 2020. Saintil derives substantial income from serving as a director of GitLab. She also solicited the 2024 Proxy Statement, which contained false and misleading statements. As a trusted Company director, Saintil conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded her duties to monitor internal controls, and failed to protect corporate assets. As she breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Saintil.

133. Demand is excused as to Defendant Sullivan. Defendant Sullivan been a Company director since January 2020 and the Lead Independent Director since March 2021. Sullivan derives substantial income from serving as a director of GitLab. He also solicited the 2024 Proxy Statement which contained false and misleading statements. As a trusted Company director, Jacobson conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, disregarded his duties to monitor internal controls, and failed to protect corporate assets. As he breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested, demand is futile as to Defendant Sullivan.

134. Further, Defendants Bedi, Blasing, and Sullivan have been members of the Audit Committee at relevant times. In these roles, they are responsible for the integrity of GitLab's financial statements and compliance with applicable laws and regulations. In their capacities as

Audit Committee members, Bedi, Blasing, and Sullivan reviewed and approved the materially misleading statements and, in contravention of the duties outlined in the Audit Committee Charter, allowed false and misleading statements to be disseminated in GitLab's SEC filings and other public statements. As such Bedi, Blasing, and Sullivan enabled the Individual Defendants' misconduct, violations of law, and failure to ensure adequate Board oversight over internal control of financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, Bedi, Blasing, and Sullivan breached their fiduciary duties and are not disinterested, and demand is further excused as to them.

135. The entire Board is charged with overseeing the Company's affairs, including the Premium tier, which constitutes a majority of GitLab's ARR. Therefore, a majority of the Board should have known of the material facts concerning this business, including that the price sensitivity among SMB customers to the Premium price increase. In their capacities as directors, a majority of the Board issued the misleading 2024 Proxy Statement which concealed the impact of the Premium price increase and, as a result, the entire Board breached their fiduciary duties and face a substantial likelihood of liability. Thus, demand is excused as to each of them.

136. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

137. Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

138. As being Board members, the Director Defendants received, and continue to receive, substantial compensation and benefits . They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof

and are incapable of exercising independent objective judgment in deciding whether to bring this action.

139. The Director Defendants' conduct described herein and summarized above could not have been the product of reasonable business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested, and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

140. Publicly traded companies, such as GitLab, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

141. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, therefore, excused.

## CLAIM I

***Against Defendants Sijbrandij, Saintil, Sullivan, Jacobson, Bedi, and Bostrom for Violations of Section 14(a) of the Exchange Act***

142. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

144. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. § 240.14a- 9.

145. Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan caused the 2024 Proxy Statement to be false and misleading by failing to disclose, among other things, that: (i) GitLab’s AI features did not have the capabilities expressed; (ii) there was weak market demand for the touted AI integration throughout the software development lifecycle; (iii) the Company was experiencing price sensitivity following the Premium price increase, especially for SMB and mid-market customers; and (iv) as a result of the above, Defendants’ statements about GitLab’s business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

146. Under the direction and watch of Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan, the 2024 Proxy Statement also failed to disclose, among other things, that: (i) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; (ii) the Individual Defendants failed to report violations of the Code of Conduct, and (iii) contrary to the 2024 Proxy Statement’s description of the Board’s and its committees’ risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

147. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading.

148. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of Defendants Bedi and Bostrom and the amendment to the Certificate of Incorporation.

149. The Company was damaged as a result of Defendants Sijbrandij's, Bedi's, Blasing's, Bostrom's, Jacobson's, Saintil's, and Sullivan's material misrepresentations and omissions in the 2024 Proxy Statement.

150. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## CLAIM II

***Against the Individual Defendants for Breach of Fiduciary Duties***

151. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GitLab's business and affairs, particularly with respect to issues as fundamental as public disclosures.

153. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

154. In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall business, operations, and prospects.

155. In breach of their fiduciary duties owed to GitLab, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

156. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GitLab.

157. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

158. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

159. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

160. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GitLab has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## CLAIM III

***Against the Individual Defendants for Unjust Enrichment***

162. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GitLab.

164. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GitLab that was tied to the performance or artificially inflated valuation of GitLab, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

165. Plaintiff, as a shareholder and a representative of GitLab, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

166. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

**CLAIM IV**

***Against the Individual Defendants for Gross Mismanagement***

167. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GitLab in a manner consistent with the operations of a publicly held corporation.

169. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GitLab has sustained and will continue to sustain significant damages.

170. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

171. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

**CLAIM V**

***Against the Individual Defendants for Waste of Corporate Assets***

172. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

174. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused GitLab to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

175. 261. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

176. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

**CLAIM V**

***Against the Insider Selling Defendants for Insider Trading***

177. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178. By reason of their fiduciary roles as officers, directors, and/or controlling persons of GitLab, the Insider Selling Defendants were given access, directly or indirectly, to material information about the Company which was not generally available to the public.

179. As officers, directors, and/or controlling persons of the Company, the Insider Selling Defendants owed GitLab the highest obligation of due care, good faith, and loyalty.

180. When the Insider Selling Defendants sold their Company stock, netting proceeds of approximately $223.4 million, as detailed *supra*, they were in possession of material, non-public information, and sold Company stock on the basis of such information, which they each knew had a significant effect on the market price of the Company's stock.

181. The Insider Selling Defendants misappropriated material information to their own benefit when they sold shares of Company stock. The Insider Selling Defendants knew that information available to them was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company common stock. As the use of GitLab's non-public information for their own personal gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, GitLab is entitled to disgorge any illegal profits obtained thereby.

182. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of GitLab and that Plaintiff is a proper and adequate representative of the Company;

B. Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to GitLab;

C. Against all of the Defendants and in favor of GitLab for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

D. Directing GitLab to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GitLab and its shareholders from a continuation or repetition of the damaging events described herein;

E. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F. Awarding GitLab restitution from Defendants, and each of them, and ordering

disgorgement of all profits, benefits and other compensation obtained by Defendants, including profits obtained by insider sales;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 28, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Jason Lianto*

**VERIFICATION**

I, Jason Lianto am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 3/27/2025.

DocuSigned by:
Jason Lianto
ED50D4BE145C4A4...

Jason Lianto